Filed 12/17/15  P. v. Valenzuela CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STUART RUBIO, HERIBERTO VALENZUELA,<br><br>    Defendants and Appellants. | B258310<br><br>(Los Angeles County<br>Super. Ct. No. BA392551) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Stephen A. Marcus, Judge.  Affirmed.

Thomas T. Ono for Appellant, Stuart Rubio.

Lynda A. Romero for Appellant, Heriberto Valenzuela.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Rama R. Maline, Deputy Attorney General for Plaintiff and Respondent.

INTRODUCTION

In the early morning hours of December 10, 2011, Appellants Stuart Rubio and Heriberto Valenzuela (collectively Appellants) murdered drug dealer Robert Hendrix during the course of a burglary and robbery. Appellants along with co-defendants Joshua Rogers and Melissa Soto were tried jointly.[1]

The jury convicted Appellants of first degree murder on count 1 (Pen. Code § 187, subd. (a)),[2] and found true the special circumstances that the murder was committed while Appellants were engaged in the commission of both robbery and burglary (§ 190.2, subd. (a)(17)). As to Appellant Rubio, the jury found true the special allegation that he personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). The trial court sentenced Rubio for the murder on count 1 to life in prison without the possibility of parole, plus a consecutive 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivision (d). Valenzuela was sentenced for the murder in count 1 to life without the possibility of parole.

Appellants contend on appeal as follows:

(1)     The trial court committed *Batson/Wheeler* error.

(2)     There was insufficient evidence to support first degree murder and special circumstances allegations of burglary and robbery convictions. And as to Rubio insufficient evidence to support the firearm enhancement of causing great bodily injury or death (§ 12022.53(d)).

(3)     As to Valenzuela, the court erroneously admitted hearsay statements made by a trial witness, and refused to modify CALJIC No. 2.13.

We find no reversible error and affirm the judgment. There is no *Batson/Wheeler* violation. The trial court properly found defendants' failed to make a requisite prima facie showing of discriminatory purpose in the prosecution's exercise of four out of its

---

[1]     A mistrial was declared as to Rogers and Soto and they are not part of this appeal.

[2]     All further references are to the Penal Code unless otherwise indicated.

first six peremptory challenges to male jurors. There is substantial evidence to support the first degree murder convictions, each of the special circumstances, and the firearm enhancement. The trial court did not abuse its discretion in admitting a witness's statement inculpating Valenzuela, nor did the court commit reversible error in refusing Valenzuela's modified CALJIC No. 2.13 instruction, and instead, giving CALJIC Nos. 2.09 and 2.13.

BACKGROUND

Hendrix lived in a room in the basement of 11950 West Trail in the Lakeview Terrace area of Sylmar. He was a drug dealer who exchanged drugs for money, watches, jewelry and other valuables. He maintained a collection of jewelry and several hundred watches, many of which he kept in a safe in his room. He wore 2 rings and kept at least 20 watches in his room.

Several days before the murder, Rubio, who did not have a car, asked Devonne Sams to give him a ride to Lakeview Terrace to rob someone. Sams responded she would let him know later.

Hours before the murder, Rubio was seen wearing a dark hoodie. On the eve of the murder, about 9:00 p.m., Rubio and Valenzuela were at the residence of David Saracione. Saracione knew Rubio possessed a loaded .38 blue steel revolver. Rubio took Saracione's .22 Ruger rifle with a shortened barrel to settle a debt. The rifle had two clips, each of which held 20-50 rounds, strapped together.

Sometime between 11:00 p.m. and 1:00 a.m., Sams picked up Rubio and Valenzuela at Rubio's house and drove them to her house. During the ride, Rubio told her "he was strapped," meaning "he had a gun on him." Rubio and Valenzuela joked about being strapped. They also talked about robbing someone who had a lot of money and owed a lot of money. At Sams's house, Rubio, who had a sawed-off shotgun or rifle, asked Sams if she had made her decision whether to drive him to Lakeview Terrace to do the robbery. She said she would not.

On December 10, 2011, about 3:10 a.m., Hendrix was murdered. He died from two gunshot wounds to the chest, one perforating his heart. His room was in disarray and signs of a struggle were apparent. The safe was empty.

Shortly before 3:09 a.m., Nadine Gonzalez was across the street from Hendrix's residence when she heard three gun shots. A car with its brake lights on was parked down the street. She heard men arguing and then a few more gunshots. When she went to Hendrix's room, she saw both doors were wide open, Hendrix, laying face down on the floor bleeding, a black bag on the floor, and two to three watches between the doors.

About the same time, Nicholas Gutierrez was in a car traveling on West Trail Road when he noticed a man wearing an all black hoodie with his face down running past his car. The man entered the rear passenger side of a dark-colored car with its brake lights on that was parked about 30 or 40 feet down the hill.

At some point, Rubio and Valenzuela along with Rogers and Soto returned to Rubio's house. One of them carried a medium-sized wooden box similar to the ones Hendrix liked. Brianne Urquidez (aka Brianne Keith) was also present at Rubio's house and regarded herself as a friend of Rubio, Valenzuela, Soto, and Rogers (who she called "Josh"). At Rogers's request, she drove Rogers and Soto to their home. Rogers was carrying a cloth shopping bag containing a significant number of items.

Trisha King, who lived at Sam's house, was a friend of Rogers, Rubio and Valenzuela. About 4:00 or 4:30 a.m., she received a phone call and then asked Sams for a ride to pick up Rubio. They drove to Rubio's house. On their arrival, Valenzuela got into the car, carrying a white laundry bag that appeared to be full and smelled strongly of bleach. When King asked where Rubio was, Valenzuela replied Rubio was in his room. Sams and King drove Valenzuela to his home less than a mile away. Outside the car, King spoke with Valenzuela. Upon her return, Sams asked, "What about the bag, the laundry bag?" King told her not to worry about it. En route to Sam's house, King threw the laundry bag into a dumpster near Sunland Park.

Barney Berrones had known Rubio, aka, "Clever," for 8 years and Phillip Acosta, aka, "Creeps," for 25 years. Three weeks before the murder, Berrones saw Rubio with a

4

.38 gun at Rubio's house. After the murders and before December 25, 2011, Berrones received five or six calls from Acosta or Rubio. In the initial call, Acosta told Berrones to get the guns from under the swing at Rubio's house on Pali Avenue. Berrones heard Rubio in the background say, "[T]ell him to go do it . . . pick them up." Acosta also asked him to move the trash can and pick up the jewelry. Berrones said he would.

Rubio later called Berrones himself and told him "basically the same thing as Creeps." Rubio directed him to hang onto the items until they met up. Rubio then told Berrones something to the effect that someone did not want to give up their "shit"; "everything went bad; [and] we had to take care of business." He added, "[T]he White boy is down; the White boy has heart."

Berrones assumed Rubio was involved in the murder and robbery of Hendrix because of the request that Berrones pick up the weapons and jewelry. Berrones did not pick up these items, because his girlfriend told him "it sounds like a setup." Acosta subsequently called Berrones and said they would take care of it.

On December 23, 2011, at about 7:15 p.m., Valenzuela, driving a stolen car, was pursued by the police. After crashing the car near Lankershim and Victory Boulevards, Valenzuela fled. The police set up a perimeter on Haynes between Troost and Irvine. A shoe was found in the carport of 11640 Haynes. In the backyard of 11636 Haynes, another shoe and a jacket were recovered. A credit card, cell phone, and iPod belonging to Hendrix were in the jacket's right pocket. A bag with watches, rings, medallions, and coins were in the left pocket.

The police found Valenzuela hiding under a vehicle in a parking lot at the intersection of Hamlin and Lankershim. He was shoeless. Following his arrest, Valenzuela was transported to the police station. An officer was holding the recovered jacket and shoes. Pointing to the jacket, Valenzuela said, "I want my jacket; it's cold in here." When the officer asked if he wanted his shoes, Valenzuela responded, "yes."

On December 27, 2011, Rubio was arrested. Gunshot residue was on the sweatshirt he was wearing.

5

During the police investigation, a white Fila shoe was found about 130 feet from Hendrix's residence. The blood on the shoe matched Hendrix's DNA profile as a major contributor and a DNA profile from the shoe matched Valenzuela's DNA. The DNA profile of the bloodstain on the stomach portion of the recovered jacket matched Valenzuela's.

At the scene, three spent shell casings and one live .22 caliber round were retrieved. A live .22 caliber long-rifle bullet was recovered. Three .22 caliber long rifle bullets were retrived from Hendrix's room. A .38/.357 caliber bullet was found lodged inside a wall of the room.

The three .22 shell casings were fired from the same .22 firearm. The .22-caliber bullet recovered from Hendrix's body matched the shell casings. The .38/.357 bullet recovered from Hendrix's body and the 38/.357 bullet lodged in the wall were fired from a revolver. The firearm expert, however, was unable to determine if they were fired from the same gun due to the damage to the bullet recovered from the body.

Chance Rutledge, a close friend of Hendrix, identified some of the recovered jewelry as belonging to Hendrix. The ring with a line of diamonds was the ring Hendrix was wearing three days before his murder.

The police recovered Hendrix's cell phone. Its phone book listed the phone numbers of Rubio and Soto. The multiple text messages from Soto's phone to Hendrix's indicated Soto was trying to get drugs from Hendrix. In her last communication, at about 12:48 a.m., on December 10, 2011, Soto texted: "It's cool. That's why I figured. Anywho, I'll see you in a few. Okay?" Cell phone evidence reflected on December 10, 2011, at 2:55 a.m. and 2:58 a.m., Rubio's phone placed two calls using the cell sector covering Hendrix's residence. At 3:06 a.m. and 3:27 a.m., Rubio's phone exchanged text messages with Soto's phone.

In his defense, Valenzuela relied on evidence that several items had not been tested for DNA and presented evidence that Rubio was the one who committed the robbery. Rubio did not present any evidence in support of an affirmative defense.

DISCUSSION

## 1. *Batson/Wheeler*

Rubio contends the judgment must be reversed, because the trial court erred in denying his *Batson/Wheeler*[3] motion based on the prosecutor's exercise of four of his initial six peremptory challenges against male jurors. No *Batson/Wheeler* violation occurred. Rubio failed to carry his threshold burden to make a prima facie showing that excusal of these four male jurors was based on impermissible gender bias.

### a. *Voir Dire Proceedings*

The prosecutor exercised his initial six peremptory challenges to excuse four males and two females in this order: Jurors 2506, 3331, 3513, 9191, 0208, and 1943. The two female jurors were 3331 and 9191.[4]

Juror 2506, a single substitute teacher, had prior jury experience on a civil case that ended in a verdict. He lived with his parents both of whom worked. He indicated he would hold against a witness the fact the witness had a rap sheet.

Juror 3331, a single DirecTV customer service and sales employee, lived with her mother. She did not want to serve on the jury, because when she was 15, she saw her uncle shot in front of her. At least four friends were in jail for violent crimes, including for shooting and murder.

Juror 3513, married with two minor children, was an optical engineer, and his wife was a homemaker.

Juror 9191, a single realtor and notary public, lived with her boyfriend, a student. She indicated she would sympathize with the victim in this case, because her uncle had been murdered in Los Angeles. Also, she was not happy with the police investigation of

---

[3]     *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

[4]     It is undisputed that these six peremptory challenges included two female jurors. A review of the voir dire proceedings reflects the female jurors were jurors 9191 and 3331.

her uncle's murder. She felt she had not been treated fairly regarding her 2011 "DUI" conviction.

Juror 0208, a married writer and producer, had a wife who was a homemaker.

Juror 1943, a single video editor, had no prior jury service. He felt he had been treated fairly with regard to his 7 year old DUI conviction.

Rubio's counsel, made a *Wheeler* motion on the ground "we're systematically excusing males."[5] Counsel for Valenzuela, Rogers, and Soto joined in the motion. Rogers' counsel, added that as to "the particular pool, up to that point in time, I think there had only been maybe three males in the panel up to that point." The trial court responded "[t]hat actually would cut against it."

Although acknowledging males is a cognizable group under *Batson/Wheeler*, the trial court denied the motion, finding no prima facie showing of discrimination had been made. The court stated the breakdown of any group was "likely to have 51 females and 49 males. It's more of a half/half situation. The only reason I bring that out is that the numbers are much larger." The court explained that in view of the numbers, dismissal of four males was insufficient, because "there are a ton of males still in the audience. . . . somewhere in the range of 40 to 50 people." The prosecutor volunteered he had exercised four peremptory challenges against males and two against females. Soto's counsel later stated, "I just want to say one last sentence about my *Wheeler*. The People's first six challenges, four of them were to males, and it resulted with an 18 pack with only one male left, who was newly seated. I'll leave it."

#### b. *Applicable Legal Principles*

"The use of peremptory challenges to eliminate prospective jurors because of group bias—that is, bias based on the juror's race, gender, ethnic background, or similar cognizable characteristic—is prohibited by the federal Constitution [Citations] and by the California Constitution [Citation]." (*People v. Reynoso* (2003) 31 Cal.4th 903, 930.)

---

[5] A motion under *Wheeler* preserves for appellate review a challenge under *Batson*. (*People v. Lenix* (2008) 44 Cal.4th 602, 610, fn 5.)

8

"The now familiar *Batson/Wheeler* inquiry consists of three distinct steps. First, the opponent of the strike must make out a prima face case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410] (*Johnson* ).)" (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 613.) "'We presume that a prosecutor uses peremptory challenges in a constitutional manner.'" (*Id*. at pp. 613-614.) The burden is on the opposing party to rebut this presumption by demonstrating impermissible discrimination. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 (*Bonilla*).)

"A prima facie case of [gender] discrimination in the use of peremptory challenges is established if the totality of the relevant facts '"gives rise to an inference of discriminatory purpose."' [Citation.]" (*Scott, supra*, at p. 384.) In this regard, our Supreme Court has identified these factors: "Although the question at the first stage concerning the existence of a prima facie case depends on consideration of the entire record of voir dire as of the time the motion was made [Citation], we have observed that certain types of evidence may prove particularly relevant. [Citation.] Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong. [Citation.] A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly

9

established' in the record [Citations] and that necessarily dispel any inference of bias. [Citations.]" (*Id*. at p. 384.)

"[A] reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination. Although a court reviewing a first-stage ruling that no inference of discrimination exists 'may consider apparent reasons for the challenges discernible on the record' as part of its 'consideration of "all relevant circumstances"' [Citation], the fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage. Because an inference of discrimination rises or falls based on the circumstances in the record, '[t]o say "the prosecutor gave a reason, therefore there is no prima facie case" is to scramble the analysis in a way that potentially eliminates the need to evaluate the prosecutor's honesty.' [Citations.]" (*Scott, supra*, 61 Cal.4th at p. 390.)

### c. *No Prima Facie Showing of Gender Group Bias*

Appellants argue the prosecutor's exercise of his initial six peremptory challenges to excuse four male jurors establishes the excusal of these jurors was for discriminatory gender group bias in violation of *Batson/Wheeler*. This contention lacks merit. They have failed to meet their threshold burden to make a primary facie showing of group bias.

Initially, we point out defendants have not produced any direct evidence of gender group bias and/or evidence sufficient to enable the trial court to draw an inference of such bias. (*People v. Gray* (2005) 37 Cal.4th 168, 186 ["'An "inference" is generally understood to be a "conclusion reached by considering other facts and deducing a logical consequence from them"'"].) Rather, a review of the entire record of voir dire discloses gender-neutral grounds upon which the prosecutor reasonably may have challenged the four males jurors. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1200 [affirm if reasonable grounds for challenge in record], abrogated on a different ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) Juror 3331 may have been challenged, because she might identify with the defendants on trial in view of the fact at least four of

10

her friends were in jail for violent crimes and her unwillingness to serve as a juror due to witnessing the shooting of her uncle might preclude her from focusing clearly and deliberating properly on the evidence at trial. Both jurors 3513 and 0208 were married and their respective wives were homemakers. The prosecutor may have challenged these two jurors based on his perception of them as possibly being prejudiced against the principal prosecution witnesses who led an unconventional lifestyle. The prosecutor may have challenged juror 1943 who had a DUI conviction, because he might identify with the defendants.

Alternatively, appellants contend they are entitled to prevail under a comparative juror analysis. We disagree a comparative juror analysis is implicated under these circumstances and decline to engage in such analysis. As our Supreme Court has explained, in this "'first-stage'" of a *Batson/Wheeler* situation, i.e., where no prima facie showing has been made, a comparative juror analysis mandated by *Miller-El v. Dretke* (2005) 545 U.S. 231 is not compelled. (*Bonilla, supra*, 41 Cal.4th at p. 350.)

## 2. *Substantial Evidence Supports Murder Conviction and Special Circumstances*

Defendants claim the evidence is insufficient to support their murder convictions and the special circumstances findings. The evidence is in fact substantial.

### a. *Standard of Review*

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]

11

'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

### b. *Substantial Evidence Supporting First Degree Murder Convictions*

The jury convicted Rubio and Valenzuela of the first degree murder of Hendrix. Substantial evidence supports these convictions under both the theory of premeditated murder and felony murder.

### c. *Applicable Legal Principles*

"First degree murder [or premeditated murder], like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing

12

the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) "Aiders and abettors may . . . be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.] Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.] . . . Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Id.* at pp. 166-167.)

Additionally, an aider and abettor liability exists for first degree felony murder. (*People v. Chiu, supra*, 59 Cal.4th at p. 166.) "First degree felony murder is a killing during the course of a felony specified in section 189, such as rape, burglary, or robbery." (*People v. Chun* (2009) 45 Cal.4th 1172, 1182 (*Chun*).) "'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.'" [Citation.]" (*Id.* at p. 1184.) "Under this scheme, no intent to kill need be established, all that is required is an intent to commit the underlying felony." (*People v. Schafer* (1987) 189 Cal.App.3d 786, 790; see also, *People v. Dillon* (1983) 34 Cal.3d 441, 475, abrogated as stated in *Chun, supra*, 45 Cal.4th at p. 1186.) In contrast, although "intent to kill [also] is an element of the felony-murder special circumstance; . . . when the defendant is an aider and abetter rather than the actual killer, intent must be proved before the trier of fact can find the special circumstance to be true." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1138-1139.)


### d. *Substantial Evidence of Premeditated Murder*

"'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in

advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]"' [Citation.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1286-1287.)

The plan was to rob Hendrix at his residence. Several days before the murder, Rubio asked Sams for a ride to Lakeview Terrace so he could commit a robbery. Saracione knew Rubio had a blue steel revolver, and Berrones had seen Rubio with a .38 firearm at Rubio's residence. On the night of December 9, 2011, shortly before the murder, Rubio took Saracione's .22 Ruger rifle with a shortened barrel along with two clips that held between 20 and 50 rounds. Later, Sams picked up Rubio and Valenzuela from Rubio's house. Rubio warned Sams to drive careful "because he was strapped," and both Rubio and Valenzuela joked about being strapped. The two also talked about robbing someone who had a lot of money. Upon arriving at Sams's house, Sams noticed Rubio had a sawed-off rifle. Rubio later left with Valenzuela, Rogers, and Soto.

Hendrix was murdered and robbed at about 3:10 a.m. on December 10, 2011. He died from two gunshot wounds to his left chest. A .22 caliber long rifle bullet and a .38/.357 magnum bullet were retrieved from his body. Both the .38/.357 magnum bullet and the one found by the police lodged in the wall of Hendrix's room were fired from a revolver. The three .22 long rifle cartridge casings found at the scene were fired from the same .22 firearm. The two doors to Hendrix's room were wide open, the room had been ransacked, watches and a black bag were on the floor.

Rubio's role in the murder and robbery of Hendrix was clarified by his admissions to Berrones. He told Berrones to pick up the guns and jewelry from their hiding place; gave him specific instructions on what to do in retrieving these items and told him to hold onto them until they could meet up. Rubio also told Berrones that "they shot" Hendrix because he "didn't want to give his shit up" and that "everything went bad; we had to take care of business." He added, "the White boy is down; the White boy has heart." Additionally, a neighbor of the victim saw a man wearing a black hoodie with his head

14

down walking at a fast pace from the vicinity where Hendrix's Filia shoe was found about 130 feet away from Hendrix's residence. The man in the black hoodie fled in a parked car. Gunshot residue consistent with someone holding a gun or rifle was found on the black hoodie sweatshirt Rubio was wearing at the time of his arrest. Hours prior to the murder Rubio was seen wearing a dark hooded sweatshirt.

All of this substantial circumstantial evidence supports the jury's findings that Rubio and Valenzuela not only planned to rob Hendrix at his residence, but also to kill him if he resisted, which he did. (See, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1183 [reasonable inference defendant considered murder in advance and entertained intent to kill in entering house with loaded gun]; *People v. Morris* (1988) 46 Cal.3d 1, 22-23 [reasonable inference "defendant went to the bathhouse with either a preconceived design to kill, or fully prepared to do so" based on his "possession of a weapon in advance of the killing, and his rapid escape to a waiting car moments afterwards"].) Further, this evidence supports the jury's findings that Rubio was an actual shooter and that he shot to kill.

Ample evidence also tied Valenzuela to the murder and robbery of Hendrix. Sometime after the incident, Sams, along with King, drove to Rubio's house where she picked up Valenzuela who had a white laundry bag smelling strongly of bleach and appeared to be full. Outside the home, Valenzuela and King conversed. On the way back to Sams's house, King threw the laundry bag in a dumpster. From this evidence, the jury was entitled to infer that the laundry bag was full of items stolen from Hendrix and that bleach had been used to get rid of blood stains. In view of the disarray at the crime scene, the jury also was entitled to infer that Valenzuela's bloodstain on the front stomach portion of his jacket resulted from Valenzuela's struggle with Hendrix. The credit card, cell phone, iPod, and the bag of watches, rings, medallions, and coins recovered from Valenzuela's jacket belonged to Hendrix. Further, Hendrix's blood and Valenzuela's DNA were on the Filia shoe belonging to Hendrix. From this evidence, the jury was entitled to infer Valenzuela's close contact with Hendrix during the struggle assisted Rubio to execute Hendrix with two gun shots to his chest.

15

### e. *Substantial Evidence of Felony Murder*

As discussed above, substantial evidence exists that the murder of Hendrix occurred during the commission of the burglary, robbery, and murder of Hendrix. No other evidence was necessary to establish the first degree felony murder of Hendrix by Rubio and Valenzuela.

### f. *Substantial Evidence Supports Burglary and Robbery Special Circumstances*

Defendants contend there is insufficient evidence to support the burglary and robbery special circumstances findings. We disagree. We have reviewed the record in light of our Supreme Court's decision in *People v. Banks* (2015) 61 Cal.4th 788 and conclude substantial evidence supports the conclusion Valenzuela was a major participant.

"The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true." (§ 190.2, subd. (a).) The two at issue here are the robbery and burglary special circumstances, i.e., "The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of . . . [¶] Robbery . . . [and] [¶] Burglary." (§ 190.2, subd. (a)(17)(A)&(G).) "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true." (§ 190.2, subd. (c).)

Rubio and Valenzuela not only robbed Hendrix, substantial evidence establishes they also committed burglary in entering Hendrix's residence. "Every person who enters

any house, room, apartment . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459) "Every burglary of an inhabited dwelling house . . . or the inhabited portion of any other building, is burglary of the first degree." (§ 460, subd. (a).) Appellants' purpose and intent in entering Hendrix's room was to rob him. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

Substantial evidence supports the true findings on the burglary and robbery special circumstances as to Rubio, the direct perpetrator in the murder of Hendrix. As for Valenzuela, an accomplice, the evidence also supports the additional requirement of intent to kill. As discussed above, substantial evidence supports Valenzuela's conviction of premeditated first degree murder, an element of which is intent to kill. Additionally, it was reasonable for the jury to infer that both Rubio and Valenzuela shot Hendrix. Rubio had a.22 sawed-off rifle shortly before the murder. Rubio was also known to have a loaded .38 revolver. A reasonable inference may be drawn that Rubio fired the .22 rifle shot into Hendrix's chest, and Valenzuela fired the .38/.357 shot using Rubio's .38 revolver.

In finding true the great bodily injury or death firearm enhancement as to Rubio, the jury necessarily found he was the direct perpetrator in Hendrix's murder. The requisite intent to kill for Valenzuela, as an accomplice, was established in the context of the premeditated murder theory, which is supported by substantial evidence.

### g. *Substantial Evidence to Sustain the Firearm Enhancement*

Rubio challenges the evidence supporting the above firearm enhancement. Substantial evidence establishes Rubio personally and intentionally discharged a firearm proximately causing great bodily injury/death. (§ 12022.53, subd. (d).) As recounted above, Rubio had a .38 revolver. Shortly before the murder, he armed himself with a .22 sawed-off rifle and admitted he was "strapped." Hendrix sustained two fatal gunshot wounds to his left chest, one from a .38/.357 bullet and one from a .22 rifle bullet.

17

Gunshot residue was found on the black hoodie Rubio was wearing when he was arrested. After the murder, Rubio made admissions to Berrones from which the jury was entitled to infer Rubio shot Hendrix because he would not give up his valuables.

### 3. *Admission of Berrones's Statement Implicating Valenzuela Not Admitted for Its Truth*

Valenzuela contends the trial court erred in admitting Berrones's statement to police implicating Valenzuela. No abuse of discretion occurred.

#### a. *Circumstances Surrounding Berrones's Testimony About Herbert*

Berrones was an acquaintance of Valenzuela, whose first name is Heriberto and was known as "Herbert." At trial, Berrones testified about his three police interviews on December 25 and 26, 2011, and January 27, 2012.

On December 25, 2011, while in jail for failing to finish a drug testing class, Berrones told police he had information about the murder of "Rob" in Lakeview Terrace. (5RT 1845-1846, 1857-1858) During the interview, he stated Rubio told him Rubio and another man, whose name was either "Josh" or "Jeremy," went to rob a guy, but the guy "didn't want to give his shit up."[6]

On December 26, 2011, Berrones told police that before he was in custody, he spoke with Sams about Hendrix's murder. Sams said "Herb" gave her a bag to get rid of. At trial, Sams testified she also told Berrones something to the effect: "I'm involved in this. I got rid of the bag. I picked up Heriberto" at Rubio's house.

In his third interview, Berrones, who no longer was in custody, told police Sams named "Herbert" as the actual person involved and that "Creeps," aka, Acosta, told him

---

[6] Specifically, Berrones told police that Rubio "said that he went to rob him again and that the guy, you know, didn't want to give his shit up. *So they shot him, I guess*, you know." (Italics added.) At trial, Berrones testified he did not recall that during Rubio's conversations with him, Rubio said "anything about a shooting somebody or somebody being shot."

18

Rubio and "Herbert" were the ones involved. The trial court admonished the jury that this testimony was offered for the jury to assess Berrones's credibility not for its truth.

Prior to Berrones's testimony regarding "Herbert," a series of sidebar conferences was held. Valenzuela's counsel objected Berrones changed his mind during the police interviews about who was involved and argued counsel was entitled to cross-examine Berrones about the source of information. The prosecutor stated Berrones told police he thought it was Josh or Jeremy but someone told him it was Herbert. The trial court at first ruled the parties could elicit testimony that Berrones got the name of another individual as the second person involved but not the specific name "Herbert," which name would be hearsay and prejudicial.

At another sidebar, the court ruled the parties could ask Berrones if he changed his mind about the identity of the second person because he got information from others so long as Herbert's name was not mentioned. The court added such testimony would not be admitted to impeach Berrones as to his original statement about Jeremy and Josh but, rather, to explain Berrones changed his mind because he got more information. The court again admonished the parties not to mention the name Herbert. The court explained this testimony would give the jury the context for why Berrones changed his mind. When Valenzuela's counsel expressed his concern that the name "Herb" already was out there, the court responded it could not do anything about that but asked if counsel wanted the court to call attention to the name. Counsel declined.

At a final sidebar, the court announced it was now ruling the parties could bring out the name Herbert not to establish "Herbert did it, but [rather, to show Berrones] thought Herbert did it and that's why he changed his mind." The court explained, "It's too difficult to hide this fact from the jury without sort of having the evidence misinterpreted or the jury speculating, and that is why it is being introduced." The court indicated it would instruct this testimony was not offered for its truth but to establish Berrones's state of mind and assist the jury in evaluating his credibility.

Valenzuela's counsel objected it was irrelevant what Berrones was thinking and no inconsistent statement was involved. Disagreeing on this was about inconsistent

19

statements, the court explained the information about Herbert pertained to why Berrones changed his mind. Counsel again objected why Berrones changed his mind was not relevant. The court found the information about Herbert was relevant because Berrones was a key witness and it affected his state of mind. The court added the jury would be given the instruction not to consider the information for its truth but consider it only as to Berrones's credibility. Counsel argued such testimony would be prejudicial and moved for a mistrial. The court stated it would entertain the motion later.

The court admonished the jury that Berrones had identified someone else and the source of this evidence was hearsay. The court instructed the jury this evidence was not being admitted for its truth and the jury was to consider the evidence only to evaluate the witness's credibility.

As cross-examination resumed, Rogers' counsel asked Berrones about his statement to police that Sams related Herbert was the real person involved and whether "Creeps" had told him the persons involved were Rubio and "Herbert." Berrones acknowledged this was the information he gave police. When asked about the basis of his first statements about Herbert, Berrones testified the source was his conversations with "Creeps." At this juncture, the trial court reminded the jury Berrones's testimony in this regard was not being offered for its truth.

At the conclusion of Berrones's testimony, Valenzuela's counsel moved for a mistrial because the testimony about Herbert involved multiple levels of hearsay and on *Aranda/Bruton*[7] grounds. The motion was denied.

### b. *Admission of Testimony About Herbert Not Abuse of Discretion*

As a preliminary matter, we point out the abuse of discretion standard applies to any ruling on the admissibility of evidence. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 (*Guerra*), overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "This standard is particularly appropriate when, as here, the trial court's

---

[7] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

determination of admissibility involved questions of relevance, the state-of-mind exception to the hearsay rule, and undue prejudice. [Citation.] Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*Guerra, supra*, 37 Cal.4th at p. 1113.)

"'[W]e review the ruling, not the court's reasoning and, if . . . correct on any ground, we affirm.' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11.)

"'""Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]"'" [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 913.)

"'""Hearsay evidence,"'" defined as 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated,' is generally inadmissible. (Evid. Code, § 1200.)" (*Guerra*, *supra*, 37 Cal.4th at p. 1113.) The "state of mind" exception to the hearsay rule allows admission of "[e]vidence of a statement of a declarant's state of mind, when offered to prove or explain the declarant's conduct, . . . as long as the statement was made under circumstances indicating its trustworthiness. [Citations.]" (*Id.* at p. 1114.)

Berrones's testimony regarding "Herbert" as the second perpetrator was not admissible under the "state of mind" exception, because Berrones's state of mind was not at issue. He was neither a charged defendant nor a victim in this case. (See *Guerra, supra*, 37 Cal.4th at p. 1116 ["Powell's state of mind as to Roberto [a third party] . . . not relevant to prove an element of an offense or to show Powell acted in conformity with

21

that state of mind"].) The trial court erroneously ruled that such testimony was admissible under this "state of mind" exception to the hearsay rule.

Nonetheless, as the trial court alternatively ruled, Berrones's testimony regarding "Herbert" was admissible to explain Berrones's change in testimony regarding the identity of the second perpetrator, a non-hearsay purpose. Evidence of an out-of-court statement is admissible when offered for a nonhearsay purpose which is relevant to an issue in dispute. (*People v. Turner* (1994) 8 Cal.4th 137, 189, abrogated on different point as stated in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) Berrones's testimony regarding the circumstances that would explain why he changed his mind about the identity of the second perpetrator was highly probative on the issue of his credibility as to "[t]he existence or nonexistence of any fact testified to by him"; his initial identification of that perpetrator as Josh or Jermey; his revised identification of him as "Herb," and his ultimate identification of "Herbert" as the perpetrator. (Evid. Code § 780, subd. (i).[8]

### 4. *Refusal to Modify CALJIC No. 2.13 Not Improper*

Valenzuela contends the trial court erred in refusing to modify CALJIC No. 2.13 to instruct that the jury could consider Berrones's testimony for the truth of the matter asserted unless the court otherwise instructed. No reversible error transpired. The proposed defense modification would have misstated the law in the context of the facts, and potentially confused the jury.

---

[8] Additionally, admission of this evidence was not prejudicial. Berrones's testimony about "Herb," which the jury was entitled to infer was Valenzuela, already was admitted, and the trial court had instructed the jury on several occasions that Berrones's testimony about "Herbert" was admitted only to assess his credibility. CALJIC No. 2.09 expressly directed the jury to consider this evidence solely for this purpose. The jury is presumed to have understood and adhered to the court's instructions. (*People v. Watson* (1956) 46 Cal.2d 818, 837-838.)

### a. *Proposed Modification of CALJIC No. 2.13*

The trial court indicated that because of the admission of hearsay evidence, the court would give CALJIC No. 2.09 regarding how the jury was to consider evidence admitted for a limited purpose.[9] Valenzuela's counsel stated Berrones's testimony about Herbert did not come in for its truth. The court agreed.

Counsel suggested CALJIC No. 2.13 regarding evidence of prior consistent or inconsistent statement should be modified to address Berrones's testimony in this regard. The court disagreed and advised counsel he could argue to the jury that the evidence was admitted for the limited purpose of testing Berrrones's credibility. The court explained it was not inclined to modify this instruction, because at least one-half dozen times other evidence had been admitted for a limited purpose and the court did not wish to single out this particular instance. The court indicated it would consider identifying Berrones's statement because that evidence potentially had the greatest prejudicial impact.

Valenzuela's counsel asked the trial court specifically to give a modified version of CALJIC No. 2.13 to this effect: "Inconsistent or consistent statements may be considered by you not only for the purpose of testing the credibility of the witness, but *unless you were instructed otherwise, you may also consider it for the truth of the facts stated by the witness on that former occasion*." (Italics added.) When asked if he wanted this highlighted text added, counsel responded yes because "this is the exact situation for . . . Berrones" in that the jury could use his inconsistent testimony both to test his credibility and for its truth, e.g., find his initial identification of Josh or Jeremy as the second person present with Rubio at the murder was true, unless the court instructed

---

[9] Pursuant to CALJIC No. 2.09, the trial court instructed the jury: "Certain evidence was admitted for a limited purpose. At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. Do not consider this evidence for any purpose except for the limited purpose for which it was admitted. This largely relates to the hearsay issues. Do you recall sometimes I said this is hearsay but it's coming in to help you understand the state of mind of the person or why he took action after hearing this, or to explain why he did something, does everybody kind of remember that? That is what that is referring to."

23

otherwise.  The court stated the proposed modification, if the court were inclined to give it, would be worked into CALJIC No. 2.09, not CALJIC No. 2.13.  The court added Berrones's testimony was not to be considered for its truth.

### b. *Refusal to Give Modified Instruction, Not Error*

"'It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.  [Citations.]'" (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)  "'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.'  [Citation.]" (*People v. Anderson* (2011) 51 Cal.4th 989, 996.)  Moreover, "the trial court may modify any proposed instruction to meet the needs of a specific trial, so long as the instruction given properly states the law and does not create confusion." (*People v. Beltran* (2013) 56 Cal.4th 935, 944, fn. 6.)  Conversely, the court may refuse an instruction offered by a defendant if it incorrectly states the law and/or is potentially confusing. (*People v. Bivert* (2011) 52 Cal.4th 96, 120.)

Valenzuela's proposed modification would have misstated the law and potentially confused the jurors.  The trial court therefore did not abuse its discretion in refusing to give the modified version of CALJIC No. 2.13.  Berrones's testimony about "Herbert" was admitted for the nonhearsay purpose of assisting the jury to evaluate Berrones's credibility, and not for its truth.  CALJIC No. 2.13, which concerns inconsistent and consistent statement exceptions to the hearsay rule,[10] therefore has no application to this

---

[10]      Pursuant to CALJIC No. 2.13, the court instructed the jury:  "Evidence that at some other time a witness made a statement or statements that is or are inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion.

24

testimony. Modifying CALJIC No. 2.13 as urged by Valenzuela would have misinstructed the jury on the law in this regard. Further, the modification also might have confused the jury, since the trial court already had instructed the jury specifically on the limited purpose of this testimony, i.e., to assist the jury in evaluating Berrones's credibility, and not for its truth.

DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIRSCHNER, J.[*]

We concur:

TURNER, P.J.

KRIEGLER, J.

---

"If you disbelieve a witness's testimony that he or she no longer remembers a certain event, that testimony is inconsistent with a prior statement or statements by him or her describing that event."

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25